# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3106

_____

Green Party of Arkansas, Mark,     *
Swaney, and Rebekah Kennedy,     *
    *
          Plaintiffs - Appellants,     *    Appeal from the United States
    *    District Court for the
       v.     *    Eastern District of Arkansas.
    *
Mark Martin, in his official capacity     *
as Secretary of State     *
of the State of Arkansas,     *
    *
          Defendant - Appellee.     *

_____

Submitted: May 10, 2011
Filed: August 9, 2011

_____

Before MELLOY and BENTON, Circuit Judges, and GRITZNER,[1] District Judge.

_____

GRITZNER, District Judge.

The Green Party of Arkansas, Rebekah Kennedy, a former candidate of the Green Party of Arkansas, and Mark Swaney, a member of the Green Party of Arkansas (collectively, the Green Party) brought this action against Arkansas Secretary of State

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

Mark Martin[2] (hereinafter, Arkansas) pursuant to 42 U.S.C. § 1983, seeking (1) a declaratory judgment that the Green Party is a political party and that Arkansas Code § 7-1-101(21)(C) (formerly Arkansas Code § 7-1-101(18)(C)) violates the Green Party's First and Fourteenth Amendment rights, and (2) an injunction preventing Arkansas from enforcing § 7-1-101(21)(C). The district court[3] granted summary judgment in favor of Arkansas. This appeal followed. We affirm.

## I.    BACKGROUND

Individuals that desire to gain access to Arkansas's ballot as a candidate for elected office may follow a number of alternative paths. A candidate may gain access to the ballot as the nominee of a state-certified political party, whose full slate of candidates are granted automatic access to the ballot. Arkansas defines a "Political Party" as "any group of voters that at the last preceding general election polled for its candidate for Governor in the state or nominees for presidential electors at least three percent (3%) of the entire vote cast for the office." Ark. Code Ann. § 7-1-101(21)(A). Arkansas currently recognizes only the Republican and Democratic parties as certified political parties.

A candidate may alternatively gain access to the ballot as a nominee of a new political party. A prospective new political party and its slate of candidates secure ballot access by filing with the Arkansas Secretary of State a petition comprised of the signatures of any 10,000 registered Arkansas voters collected in a ninety-day period. See Ark. Code Ann. § 7-7-205.[4] If the petition for certification fulfills the

---

[2]Mark Martin was elected Arkansas Secretary of State and is automatically substituted for Charlie Daniels. See Fed. R. App. P. 43(c)(2).

[3]The Honorable D.P. Marshall Jr., United States District Judge for the Eastern District of Arkansas.

[4]We address Arkansas Code § 7-7-205 as it existed at the time the Green Party filed this action and against which it asserts its claims.

requirements of § 7-7-205, the prospective new political party's slate of candidates is granted ballot access. However, the new political party will only maintain status as a political party if it "obtain[s] three percent (3%) of the total vote cast for the office of Governor or nominees for presidential electors at the first general election after certification." Ark. Code Ann. § 7-7-205(e)(4). A new political party that "fails to obtain three percent (3%) of the total votes cast at an election for the office of Governor or nominees for presidential electors, . . . cease[s] to be a political party." Ark. Code Ann. § 7-1-101(21)(C).

A political group not recognized as either a certified or a new political party may still secure ballot access for its candidates for President and Vice President by filing with the Arkansas Secretary of State a petition comprised of the signatures of any 1000 registered Arkansas voters. Ark. Code Ann. § 7-8-302(5)(B). As with a party that gains access as a new political party under § 7-7-205(e)(4), a political party securing ballot access under § 7-8-302(5)(B) will be recognized as a political party for the next general election if it succeeds in securing for its candidate three percent of the vote for presidential electors. See Ark. Code Ann. § 7-1-101(21)(A).

A candidate may also gain access to the ballot as an independent candidate by petition. "If the person is a candidate for state office or for United States Senator in which a statewide race is required, the person shall file petitions signed by not less than three percent (3%) of the qualified electors of the state or which contain ten thousand (10,000) signatures of qualified electors, whichever is the lesser." Ark. Code Ann. § 7-7-103(b)(1)(B). Candidates seeking county, township, or district office need only file a petition "signed by not less than three percent (3%) of the qualified electors in the county, township, or district in which the person is seeking office, but in no event shall more than two thousand (2,000) signatures be required for a district, county, or township office." Ark. Code Ann. § 7-7-103(b)(1)(A). A candidate that gains access to the ballot through independent petition may not list his

or her preferred party affiliation on the ballot. <u>See</u> Ark. Code Ann. § 7-5-207(d)(1)(B).

Finally, a candidate may gain access to the ballot as a write-in candidate by filing with the Secretary of State or county clerk, where appropriate, a notice of write-in candidacy, a political practices pledge, and an affidavit of eligibility for the office the candidate seeks to hold. <u>See</u> Ark. Code Ann. § 7-5-205.

The Green Party, seeking to be recognized as a certified political party in Arkansas, successfully petitioned to become a new political party in 2006, 2008, and 2010 by filing with the Arkansas Secretary of State petitions comprised of the signatures of 10,000 registered Arkansas voters. The Green Party spent $40,000 in 2006, $30,000 in 2008, and $14,000 in 2010 in order to complete its petition drives. Following certification as a new political party, the Green Party's slate of candidates was granted access to the ballot and experienced some successes.[5] However, in 2006, Green Party candidate for Governor Jim Lendall received only 12,774 votes out of 774,680 cast (1.65%); in 2008, Green Party candidates for President and Vice President Cynthia McKinney and Rosa Clemente received only 3470 votes out of 1,086,617 cast (0.32%); and in the 2010 gubernatorial election, of which this Court takes judicial notice, Green Party candidate for Governor Jim Lendall received only 14,513 votes out of 781,332 cast (1.9%), <u>see</u> Arkansas Secretary of State, <u>Vote Naturally</u>, http://www.votenaturally.org/electionresults/index.php?ac:show:contest-

---

[5]For instance, in the 2008 election, four Green Party candidates running for U.S. Senate and U.S. House of Representatives seats each received more than 15% of the votes cast in each respective race. In each of these races, a Democrat or Republican candidate would have run unopposed but for the presence of a Green Party candidate on the ballot. One Green Party candidate, Richard Carroll, ran unopposed and won a seat in the Arkansas House of Representatives.

_statewide=1&elecid=231&contestid=4 (last visited July 28, 2011).[6] Based upon the 2006, 2008, and 2010 election results, the Green Party failed to maintain its status as a political party under § 7-1-101(21)(C).

The Green Party filed a declaratory judgment action in the U.S. District Court for the Eastern District of Arkansas, contending that (1) Section 7-1-101(21)(C) violates the Green Party's associational rights pursuant to the First and Fourteenth Amendments because it is not narrowly tailored to advance a compelling state interest, and (2) the Arkansas Secretary of State misinterpreted § 7-1-101(21)(C). The district court granted Arkansas's motion for summary judgment and denied the Green Party's requested declaratory and injunctive relief. On appeal, the Green Party challenges the district court's finding that § 7-1-101(21)(C) does not severely interfere with its right of association and therefore does not impermissibly burden the Green Party's First and Fourteenth Amendment rights.[7]

## II.    DISCUSSION
### A.    Standard of Review

"We review a district court's decision to grant a motion for summary judgment de novo, applying the same standards for summary judgment as the district court." Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 514 (8th Cir. 2011). Because the facts are not in dispute, we determine whether the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a).

---

[6]We take judicial notice of the Arkansas 2010 election, which occurred after the district court's grant of summary judgment. See Fed. R. Evid. 201(b)(2).

[7]The Green Party does not challenge the district court's conclusion that the Eleventh Amendment barred the district court's consideration of whether the former Arkansas Secretary of State misinterpreted § 7-1-101(21)(C).

**B.	Constitutional Constraints on State Election Laws**

"The States possess a 'broad power to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices.'" Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 451 (2008) (quoting Clingman v. Beaver, 544 U.S. 581, 586 (2005)). Therefore, it is beyond question that "States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986). Although the power of the States to regulate the electoral process is expansive, that power may not be implemented in a manner that violates the Constitution. See Wash. State Grange, 552 U.S. at 451 (citing Williams v. Rhodes, 393 U.S. 23, 29 (1968)). Thus, each State must "observe the limits established by the First Amendment rights of the State's citizens," Eu v. San Francisco County Democratic Central Committee, 489 U.S. 214, 222 (1989) (quoting Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217 (1986)), including "the right of citizens to associate and to form political parties for the advancement of common political goals and ideas," Timmons v. Twin Cities Area New Party, 520 U.S. 351, 357 (1997) (citing Colorado Republican Federal Campaign Committee v. Federal Election Commission, 518 U.S. 604, 616 (1996); Norman v. Reed, 502 U.S. 279, 288 (1992); Tashjian, 479 U.S. at 214). Indeed, "[r]epresentative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views. The formation of national political parties was almost concurrent with the formation of the Republic itself." Cal. Democratic Party v. Jones, 530 U.S. 567, 574 (2000).

To determine whether a State overstepped the limitations of its broad regulatory powers by enacting a ballot access scheme that impermissibly infringes upon the rights of citizens to associate, we must

> weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.

Timmons, 520 U.S. at 358 (internal quotation marks and citations omitted). Thus, we observe that "not every electoral law that burdens associational rights is subject to strict scrutiny."[8] Clingman, 544 U.S. at 592 (citing Nader v. Schaffer, 417 F. Supp.

---

[8]In Libertarian Party v. Bond, 764 F.2d 538, 541-42 (8th Cir. 1985), a case cited by both parties, we applied strict scrutiny even though the Libertarian Party routinely gained access to Missouri's ballot and "the Missouri election scheme d[id] not place significant burdens on those seeking to obtain a place on the ballot." However, because in Bond we complied with Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 184-85 (1979), and applied strict scrutiny, does not compel us to automatically do so here. In Manifold v. Blunt, 863 F.2d 1368, 1373 n.9 (8th Cir. 1988), we discussed the continuing transformation of the standard of review applied by the Supreme Court in election law cases, recognizing that numerous standards had been applied by the Supreme Court, but not laboring over the appropriate application of each because "the ballot access requirement at issue . . . passe[d] constitutional muster under any standard used by the Court – traditional strict scrutiny, the lessened scrutiny of Storer[ v. Brown, 415 U.S. 724 (1974)], the minimal scrutiny of Jenness[v. Fortson, 403 U.S. 431 (1971)], or the balancing test of Anderson[ v. Celebrezze, 460 U.S. 780 (1983)]." In Republican Party of Arkansas v. Faulkner County, Arkansas, 49 F.3d 1289, 1296 (8th Cir. 1995), we recognized that "[t]he Supreme Court has not spoken with unmistakable clarity on the proper standard of review for challenges to provisions of election codes." Following further development of Anderson and its progeny, we acknowledged that the current state of the law demands that, where lesser burdens are imposed, we must apply a less exacting review. See, e.g., Initiative & Referendum Inst. v. Jaeger, 241 F.3d 614, 616 (8th Cir. 2001) ("The Supreme Court has developed a sliding standard of review to balance [First Amendment speech concerns and the rights of states to regulate

837, 849 (D. Conn.), aff'd, 429 U.S. 989 (1976)).  Accordingly, the Court proceeds to analyze the burdens imposed to discern the level of scrutiny required in this case.

### 1.    Burden Imposed by § 7-1-101(21)(C)

Because "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms," Timmons, 520 U.S. at 359, we must first determine whether § 7-1-101(21)(C) imposes a burden upon the Green Party, and if so, the significance of that burden.  The Green Party argues that § 7-1-101(21)(C) inflicts a severe burden because: (1) § 7-1-101(21)(C) infringes upon the Green Party's associational rights by effectively obligating the Green Party to either run candidates in the races for Governor and presidential electors, or else petition for ballot access biannually; (2) the petition process compels the Green Party to spend significant funds in order to secure ballot access; (3) alternative parties have struggled to avoid decertification; and (4) § 7-1-101(21)(C) was enacted for the discriminatory purpose of preventing alternative parties from gaining ballot access.

Arguing that § 7-1-101(21)(C) interferes with the Green Party's associational rights by obligating it to either run candidates in the races for Governor and presidential elections or face a petition drive biannually, the Green Party suggests that Arkansas's objective in maintaining ballot integrity would be adequately fulfilled were Arkansas to grant complete ballot access to any party whose candidate secured three percent or more of the vote in any statewide election.  Such a scheme, the Green Party contends, would more consistently reflect the Green Party's desire to focus on local elections, and would allow it to avoid a decision to either field competitive candidates for the gubernatorial and presidential elections or to complete a biannual petition.  Relying on Jones, Eu, and Tashjian, the Green Party frames the issue as one

---

elections].   Severe burdens on speech trigger an exacting standard in which regulations must be narrowly tailored to serve a compelling state interest, whereas lesser burdens receive a lower level of review." (citing Timmons, 520 U.S. at 358-59)).

in which the "forced 'association' is not with certain members of the electorate, but with certain races which the party for strategic reasons may not want to pursue." Appellants' Reply Br. 5.

Arkansas counters that the races for Governor and presidential electors consistently draw candidates from both the Republican and Democratic parties, in addition to candidates from a host of alternative parties, whereas many other statewide races in Arkansas are uncontested. By tying continued certification to the races for Governor and presidential electors, Arkansas argues that it is better able to measure the support of political parties by drawings its conclusions from fully contested races. Although the Constitution protects the Green Party's right to determine "the boundaries of its own association," and to formulate "the structure which best allows it to pursue its political goals," Tashjian, 479 U.S. at 224, Arkansas argues that any burden imposed by § 7-1-101(21)(C) does not severely infringe the Green Party's ability to organize itself.

The Supreme Court applied strict scrutiny in Jones, Eu, and Tashjian to determine whether state election laws violated associational rights. See Jones, 530 U.S. at 582; Eu, 489 U.S. at 225; Tashjian, 479 U.S. at 216. The laws at issue in Jones, Eu, and Tashjian regulated fundamental issues of political party autonomy, including who may participate in the primary process, see Jones, 530 U.S. at 581 (analyzing California law that created blanket primary system in which a voter of any political party was permitted to vote for any candidate in any other political party); Tashjian, 479 U.S. at 216 (analyzing Connecticut law that prohibited political parties from inviting voters registered as independents to vote in party primaries), and whether a political party could publicly state its preference for a candidate, see Eu, 489 U.S. at 225 (analyzing California law that regulated the internal affairs of political parties and prohibited official governing bodies of political parties from endorsing candidates in political party primary elections).

Section 7-1-101(21)(C) is distinguishable from those laws at issue in Jones, Eu, and Tashjian because § 7-1-101(21)(C) does not force the Green Party "to adulterate their candidate-selection process – the basic function of a political party, – by opening it up to persons wholly unaffiliated with the party," Jones, 530 U.S. at 581 (internal quotation marks and citation omitted), does not "prevent[] [the Green Party] from promoting candidates at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community," Eu, 489 U.S. at 224 (internal quotation marks and citation omitted), and does not "place[] limits upon the group of registered voters whom the [Green] Party may invite to participate in the basic function of selecting the Party's candidates," Tashjian, 479 U.S. at 215-16 (internal quotation marks and citation omitted). Thus, while the state laws at issue in Jones, Eu, and Tashjian all interfered with central objectives of a political party, in contrast, § 7-1-101(21)(C) "does not regulate the [Green Party]'s internal processes, its authority to exclude unwanted members, or its capacity to communicate with the public." Clingman, 544 U.S. at 590.

We reject the Green Party's argument that § 7-1-101(21)(C) infringes the Green Party's right to make "philosophical and strategic decisions that shape the association's political views and, through its candidates, express those views to the public," Appellants' Br. 35, because "[t]he Constitution does not require that [Arkansas] compromise the policy choices embodied in its ballot-access requirements to accommodate the [Green Party's] strategy." Timmons, 520 U.S. at 365. We cannot conclude that § 7-1-101(21)(C) severely infringes the Green Party's association rights specifically by encouraging successful participation in the gubernatorial and presidential elections. Were we to decide that a putative political party is severely burdened whenever election laws reward participation in a specific election in which the party claims it has no desire to participate, the entire concept of a system of well-regulated election laws would cease to have meaning. See Clingman, 544 U.S. at 589 ("'If the concept of freedom of association is extended' to a voter's every desire at the

ballot box, 'it ceases to be of any analytic use.'" (quoting Tashjian, 479 U.S. at 235 (Scalia, J., dissenting))).

The Green Party also argues that § 7-1-101(21)(C) severely infringes upon its associational rights by effectively imposing the financial hardship of petitioning every two years. However, the Green Party may incur some cost in completing a petition drive without rendering the effects of § 7-1-101(21)(C) severely burdensome. Indeed, "[m]any features of our political system – e.g., single-member districts, 'first past the post' elections, and the high costs of campaigning – make it difficult for third parties to succeed in American politics." Timmons, 520 U.S. at 362. We note that Arkansas does not impose a fixed fee in order to gain access to its ballot. See, e.g., Lubin v. Panish, 415 U.S. 709, 718 (1974) ("Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests."). Further, we have previously concluded that a Missouri statute requiring an indigent, putative candidate for governor to submit a "petition signed by the number of registered voters in the state equal to at least one-half of one percent of the total number of votes cast in the state for governor at the last election," in lieu of paying a $200 filing fee provided a "constitutionally adequate alternative means of ballot access." Lindstedt v. Mo. Libertarian Party, 160 F.3d 1197, 1199 (8th Cir. 1998) (per curiam). Although the Green Party may incur some costs because of its choice to hire individuals to collect signatures, the ballot access scheme does not impose severe burdens on the Green Party and Arkansas need not collapse every barrier to ballot access. See Am. Party of Texas v. White, 415 U.S. 767, 794 (1974) (noting that the States need not "finance the efforts of every nascent political group seeking to organize itself").[9]

_____

[9]Although the legitimacy of Arkansas's petition provision, § 7-7-205, is not before us, we must consider the statute as a whole, and thus consider it in conjunction with § 7-1-101(21)(C). See Rhodes, 393 U.S. at 34 (considering the totality of state election laws as a whole). To that end, we observe that "States may . . . impose on

Next, the Green Party argues that new political parties in Arkansas have struggled to avoid decertification after gaining ballot access, and point to Ross Perot's Reform Party as the only party other than the Republicans or the Democrats that has succeeded in satisfying § 7-1-101(21)(C)'s three percent support requirement. However, when Arkansas's electoral scheme is read in its entirety, see Rhodes, 393 U.S. at 34, achieving ballot access is far from an impossible task, see, e.g., Green Party of Arkansas v. Priest, 159 F. Supp. 2d 1140, 1144 (E.D. Ark. 2001) (finding that the burden imposed upon a new party seeking ballot access for a special election was severe because the regulatory scheme "ma[d]e it impossible for new and emerging political parties to gain recognition in odd-numbered years in time to participate in any special elections that might occur"). Achieving ballot access is a task that can be, and has been, accomplished with regularity. The petition process permits the Green Party to secure ballot access by submitting 10,000 signatures from any registered Arkansas voters, including those that later choose to vote in another party's primary election. See Jenness v. Fortson, 403 U.S. 431, 432, 442 (1971) (concluding state ballot access statute that required the submission of "a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question," was not impermissibly burdensome in part because the state "imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes").

Although the Green Party argues that alternative parties have experienced hardships in achieving access to the ballot, the Green Party's success in securing

---

minor political parties the precondition of demonstrating the existence of some reasonable quantum of voter support by requiring such parties to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election." Lubin, 415 U.S. at 718. The 10,000 signature threshold is a legislatively crafted solution to the district court's order in Green Party of Arkansas v. Daniels, 445 F. Supp. 2d. 1056 (E.D. Ark. 2006).

ballot access as a new political party in 2006, 2008, and 2010[10] diminishes its own argument. See Storer v. Brown, 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.").

The Green Party also urges us to apply strict scrutiny suggesting that § 7-1-101(21)(C) was enacted with the discriminatory purpose of preventing any party other than the Republican or Democratic party from gaining certified political party status. However, the Green Party's evidence that § 7-1-101(21)(C) was enacted with a discriminatory purpose is at best speculative. On this record, we discern no discriminatory intent. Rather, Arkansas's ballot access scheme is facially neutral and applies its requirements to every party, both nascent and established, in the same manner. Although the operation of Arkansas's ballot access scheme may in practice favor the established Republican and Democratic parties, "the States' interest permits them to enact reasonable election regulations that may, in practice, favor the traditional two-party system." Timmons, 520 U.S. at 367 (internal citation omitted).

Finally, we note that Arkansas's ballot access scheme, while unique in its particulars, is common in its approach. At least sixteen states correlate the performance of a party's candidate in the race for a specific office with the party's ability to remain a state-certified political party.[11] "To deem ordinary and widespread

---

[10]Following oral argument, Arkansas filed an unopposed supplement informing the Court that the Libertarian Party of Arkansas successfully completed the petition process and was certified as a new political party on June 16, 2011. Although our decision would remain unchanged if the Libertarian Party had not successfully petitioned for ballot access, the Libertarian Party's certification is further evidence that Arkansas's ballot access scheme does not impose undue burdens.

[11]See Alaska Stat. Ann. § 15.80.010(25) (West); Ariz. Rev. State. Ann. § 16-804(A); Ark. Code Ann. § 7-1-101(21)(A) (West); Ind. Code Ann. § 3-8-7-25(2)

burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." Clingman, 544 U.S. at 593.

When considered as a whole, we conclude that Arkansas's ballot access laws "do not operate to freeze the political status quo," Jenness, 403 U.S. at 438, because Arkansas's laws do not prevent the Green Party from participating in the electoral process. To the contrary, the Green Party retains the freedom to nominate and endorse candidates of its choice, to convey its message to voters, and to structure itself in the manner it prefers. Alternative parties not certified as a political party may secure ballot access for their entire slate of candidates by filing a petition comprised of the signatures of 10,000 registered Arkansas voters, or roughly six-tenths of one percent of all registered Arkansas voters. Candidates running for county, township, or district office may secure ballot access by filing a petition comprised of at most 2000 signatures, and candidates running for president may secure ballot access by filing a petition comprised of a mere 1000 signatures. Candidates may even run for office as a write-in candidate without filing any petition. Moreover, the Green Party's access to the ballot has not been merely theoretical. As we discussed, the Green Party secured ballot access for its entire slate of candidates in 2006, 2008, and 2010, each year exhausting fewer resources to complete the petition process. Therefore, we agree with the cogent analysis of the district court that although the burdens imposed by § 7-1-101(21)(C) are not trivial, they are not severe. See Timmons, 520 U.S. at 363.

---

(West); Iowa Code Ann. § 43.2 (West); Ky. Rev. Stat. Ann. § 118.325(1) (West); Md. Code Ann., Election Law, § 4-103 (West); N.H. Rev. Stat. Ann. § 652:11; N.M. Stat. Ann. § 1-1-9 (West); New York Election Law § 1-104(3) (McKinney); N.C. Gen. State. Ann. § 163-96(a) (West); Ohio Rev. Code Ann. § 3517.01(A)(1) (West); Okla. Stat. Ann., tit. 26, § 1-109(A) (West); S.D. Codified Laws § 12-1-3(10); W. Va. Code Ann. § 3-1-8 (West); Wyo. Stat. Ann. § 22-1-102(a)(xvii).

### 2.    Arkansas's Regulatory Interests

Because we conclude that the burdens Arkansas imposes on the Green Party's First and Fourteenth Amendment rights are not severe, Arkansas's "asserted regulatory interests need only be 'sufficiently weighty to justify the limitation' imposed on the party's rights." Timmons, 520 U.S. at 364 (quoting Norman, 502 U.S. at 288-289); see also Wash. State Grange, 552 U.S. at 458 ("Because we have concluded that [the state law at issue] does not severely burden respondents, the State need not assert a compelling interest."); Clingman, 544 U.S. at 593 ("When a state electoral provision places no heavy burden on associational rights, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" (quoting Timmons, 520 U.S. at 358)). "Accordingly, we have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." Wash. State Grange, 552 U.S. at 452 (quoting Burdick v. Takushi, 504 U.S. 428, 438 (1992)).

Arkansas identifies its goals of preventing ballot overcrowding, frivolous candidacies, and voter confusion as important regulatory interests that justify § 7-1-101(21)(C)'s decertification requirement in light of Arkansas's entire ballot access scheme.  The Green Party responds that no evidence exists that Arkansas currently suffers from voter confusion, ballot overcrowding, or frivolous candidacies, and thus the current ballot access scheme is unnecessary to maintain Arkansas's electoral integrity.  However, the dictates of the Supreme Court "have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." Munro, 479 U.S. at 194-95.  Arkansas is not compelled to provide empirical evidence attempting to establish what may happen absent the disqualification provision found in § 7-1-101(21)(C). See id. at 195.  As the Supreme Court reasoned in Munro, to require Arkansas to provide such empirical evidence by "prov[ing] actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access

restrictions would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State to prove the predicate." Id. Arkansas need not allow itself to be harmed by such ills before enacting appropriate measures to prevent harm. See id. at 195-96 ("Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.").

Weighed against the burdens placed upon the Green Party, the regulatory interests of Arkansas are significant. We agree with Arkansas that § 7-1-101(21)(C) furthers Arkansas's "interest in the stability of its political system," Storer, 415 U.S. at 736, by preventing ballot overcrowding, frivolous candidacies, and voter confusion by ensuring that each political party given full access to the ballot maintains a modicum of support in each election cycle. Arkansas need not, as the Green Party advocates, provide automatic ballot access to any putative party that secures three percent or more of the vote in any statewide race. It is not unfair for Arkansas to tie the test for a political party's support to the races for governor and presidential electors, traditionally the two races in Arkansas that have garnered the most overall votes, thus furthering Arkansas's interests by providing the broadest basis on which to test a party's support. See Anderson v. Celebrezze, 460 U.S. 780, 788 (1983) ("We have recognized that, 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" (quoting Storer, 415 U.S. at 730)).

This conclusion gains additional support in that far more burdensome ballot access schemes have been approved by the Supreme Court and the First, Fourth, and Tenth Circuits. See Jenness, 403 U.S. at 433 (upholding Georgia ballot access laws that defined a political party as "[a]ny political organization whose candidate received 20% or more of the vote at the most recent gubernatorial or presidential election," and required candidates who were not members of a defined political party to submit a

nominating petition signed by "a number of electors of not less than five per cent. [sic] of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking"); McLaughlin v. N.C. Bd. of Elections, 65 F.3d 1215, 1219 (4th Cir. 1995), cert. denied, 517 U.S. 1104 (1996) (upholding North Carolina ballot access scheme that decertified political parties that failed to poll 10% of the votes cast in election for governor or president, and provided opportunity for party to regain its right to nominate candidates as a new party "by submitting petitions signed by registered voters numbering at least 2% of the total number of votes cast in the prior general gubernatorial election" (citing N.C. Gen. Stat. § 163-97 (West)); Libertarian Party of Maine v. Diamond, 992 F.2d 365, 367 (1st Cir.), cert. denied, 510 U.S. 917 (1993) (upholding Maine law that allowed a group of voters to qualify as a new political party and secure ballot access by filing a petition "signed by voters numbering at least 5% of the votes cast in the preceding gubernatorial election" or by organizing "around a prior candidate for the office of Governor or President" that "received more than 5% of the total Maine vote cast" and "was not affiliated with a registered party" (citing Me. Rev. Stat. Ann. Tit. 21, §§ 302-303)); Rainbow Coal. v. Okla. State Election Bd., 844 F.2d 740, 741-42 & n.3 (10th Cir. 1988) (upholding Oklahoma law under which a political body could become a political party by filing petitions with "the signatures of registered voters equal to at least five percent (5%) of the total votes cast in the last General Election either for Governor or for electors for President and Vice President," but would be decertified if the party's "nominee for Governor or its nominees for electors for President and Vice President fail to receive at least ten percent of the total votes cast in any general election" (quotations omitted) (citing Okla. Stat. Ann., tit. 26, § 1-108 (1983 & Supp. 1987), amended by 2011 Okla. Sess. Serv. Ch. 196)). In light of compelling Supreme Court precedent, the many alternative paths Arkansas provides to the ballot, and the Green Party's own success in achieving ballot access, we must conclude that while the burdens imposed on the Green Party's rights do exist, they are significantly outweighed by Arkansas's important regulatory interests.

## III.  CONCLUSION

We conclude that Arkansas's ballot access scheme does not impermissibly burden the Green Party's constitutional rights.[12]  The judgment of the district court is affirmed.

_____

---

[12]Because Arkansas's important regulatory interests justify the limitations placed upon the Green Party, we need not consider Arkansas's argument that avoiding additional cost also justifies the limitations.