# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 10-3212

———————

| | | |
|---|---|---|
| Libertarian Party of North Dakota; | * | |
| Richard Ames; Thommy Passa; | * | |
| Anthony Stewart, | * | Appeal from the United States |
| | * | District Court for the |
| Appellants, | * | District of North Dakota. |
| | * | |
| v. | * | |
| | * | |
| Alvin Jaeger, | * | |
| | * | |
| Appellee. | * | |

———————

Submitted: May 11, 2011
Filed: October 17, 2011

———————

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

———————

BYE, Circuit Judge.

The Libertarian Party of North Dakota and three party candidates from the 2010 North Dakota state elections challenge the constitutionality of North Dakota Century Code § 16.1-11-36. The party and candidates contend this statute as applied to them violates the First and Fourteenth Amendment and the Equal Protection Clause because it prevented the candidates' names from appearing on the 2010 general election ballot despite their winning the party's primary. The party and candidates sought a preliminary injunction, which the North Dakota Secretary of State Alvin Jaeger, who was named in the suit in his official capacity, opposed by filing a motion

to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court[1] granted Secretary Jaeger's motion and dismissed the complaint, therein denying the motion for a preliminary injunction. The Libertarian Party of North Dakota and the three candidates appeal the dismissal of their claims. We affirm.

I

In North Dakota's elections for state legislature, a candidate is listed on the primary election ballot based on one of two qualifying methods: filing a petition or receiving a party endorsement. A candidate filing a petition is required to include a number of signatures equal to the lesser of 1% of the legislative district's population or 300 people. A candidate entering the ballot by endorsement need only file a Certificate of Endorsement from the party, which does not require any number of signatures from the electorate. N.D. Cent. Code § 16.1-11-11(1)-(2) (hereinafter "N.D.C.C."). However, following the primary election, the candidate receiving the highest number of votes within his or her party designation in the primary election will be named on the general ballot only if the number of votes the candidate received equals the number of signatures which was, or would have been, required to have the candidate's name placed on the primary election ballot through petition—that number being the lesser of either 1% of the district population or 300 votes. N.D.C.C. §§ 16.1-11-36 and 16.1-11-11(2)(c)(4)-(5).[2]

---

[1]The Honorable Ralph R. Erickson, Chief Judge, United States District Court for the District of North Dakota.

[2]North Dakota Century Code § 16.1-11-36 states:

A person may not be deemed nominated as a candidate for any office at any primary election unless that person receives a number of votes equal to the number of signatures required, or which would have been required had the person not had the person's name placed on the ballot through

Thommy Passa, Anthony Stewart, and Richard Ames are members of the Libertarian Party of North Dakota ("LPND"). Each pursued seats in the North Dakota State Legislature in 2010 and was named on the primary election ballot pursuant to nominations by the LPND: Passa was nominated for the House of Representatives, 43rd District; Stewart for the House of Representatives, 17th District; and Ames for the Senate, 25th District. During the primary election each received the highest number of votes within the LPND for his respective seat: Passa received four votes, Stewart received six votes, and Ames received eight votes. The North Dakota Secretary of State Alvin Jaeger declined to include Passa, Stewart, and Ames on the general election ballot because they failed to obtained the required number of votes under N.D.C.C. § 16.1-11-36. Based on the respective district populations, Passa needed 132 votes, Stewart needed 130 votes, and Ames needed 142 votes.

On July 20, 2010, after Secretary Jaeger refused to place their names on the general election ballot, the LPND, Passa, Stewart, and Ames ("the LPND and candidates" collectively) filed a complaint with the district court, naming Secretary Jaeger, in his official capacity, as defendant. In the complaint, the LPND and candidates challenged the constitutionality of N.D.C.C. § 16.1-11-36, alleging it unduly burdens their rights under the First and Fourteenth Amendment and violates the Equal Protection Clause. The LPND and candidates then filed a motion for a preliminary injunction. Secretary Jaeger opposed the preliminary injunction and filed

a certificate of endorsement, on a petition to have a candidate's name for that office placed on the primary ballot.

In addition, North Dakota Century Code § 16.1-11-11(2)(c)(4)-(5) provides the number of signatures required for a person who had not had his name placed on the ballot through a certificate of endorsement, which requires "the signatures of at least one percent of the total resident population of the legislative district as determined by the most recent federal decennial census. In no case may more than three hundred signatures be required."

a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The LPND and candidates responded to the motion to dismiss, requesting oral argument. On September 3, 2010, the district court issued its order granting the motion to dismiss, and denying both the motion for a preliminary injunction and the request for oral argument. The LPND and candidates appealed challenging the district court's order dismissing their complaint.

II

We review de novo a dismissal for failure to state a claim. Fed. R. Civ. P. 12(b)(6); Detroit Gen. Ret. Sys. v. Medtronic, Inc., 621 F.3d 800, 804 (8th Cir. 2010). In reviewing a dismissal, "[w]e accept the factual allegations of the complaint as true, but the allegations must supply sufficient 'facts to state a claim to relief that is plausible on its face.'" O'Neil v. Simplicity, Inc., 574 F.3d 501, 503 (8th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Thus, on appeal, we must determine whether the LPND and candidates failed to state a claim upon which relief could be granted, construing the complaint in their favor.

III

**A.  First and Fourteenth Amendment Challenge**

The LPND and candidates first challenge the constitutionality of N.D.C.C. § 16.1-11-36 claiming it unduly burdens their First and Fourteenth Amendment rights. In considering a challenge to a ballot access statute, we are reminded "[b]allot access statutes are not susceptible of easy analysis, nor is the appropriate standard of review always easy to discern." McLain v. Meier, 637 F.2d 1159, 1163 (8th Cir. 1980) (hereinafter "McLain I"). Although several cases address ballot access issues, no opinion from either the United States Supreme Court or the Eighth Circuit has clearly defined the appropriate standard for reviewing these constitutional challenges.

-4-

Instead, each provides for a case-by-case assessment of the burdens and interests affected by a disputed statute, focusing on the statute as part of a ballot access scheme in its totality. McLain v. Meier, 851 F.2d 1045, 1049 (8th Cir. 1988) (hereinafter "McLain II"). We may uphold a specific ballot access statute as constitutional so long as the restrictions it imposes are reasonable, justified by reference to a compelling state interest, and do not go beyond what the state's compelling interests actually require. McLain I, 637 F.2d at 1163. In other words, we review the statute under a form of strict scrutiny referred to as the "compelling state interest test" by first determining whether the challenged statute causes a burden of some substance on a plaintiff's rights, and if so, upholding the statute only if it is "narrowly drawn to serve a compelling state interest." McLain II, 851 F.2d at 1049.

Despite this rigid standard, not all restrictions on the right to vote or the right to associate are necessarily invalid. Storer v. Brown, 415 U.S. 724, 729 (1974). The states must ensure elections are fair, honest, and orderly, which necessarily requires "substantial regulation." Id. at 730. And, over time, "the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." Id. "It is very unlikely that all or even a large portion of the state election laws would fail to pass muster . . . ." Id. As explained by the United States Supreme Court in Anderson v. Celebrezze, 460 U.S. 780, 789 (1983):

> Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. . . . Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify

-5-

and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

(internal citations omitted). Thus, we begin by reviewing the LPND and candidates' alleged injury, the state's asserted interest, and the necessity of the statute in furthering that interest.

In application, the crux of this analysis is to determine whether the challenged statute "'freezes the status quo'" of a two-party system, or whether "[i]t affords minority political parties a real and essentially equal opportunity for ballot qualification." Am. Party of Tex. v. White, 415 U.S. 767, 787-88 (1974); see also Storer, 415 U.S. at 728 (noting the state must provide a "feasible means for other political parties and other candidates to appear on the general election ballot") (citing Williams v. Rhodes, 393 U.S. 23 (1968)). Restated, the need for fair and orderly elections requires states to enact restrictions on the election process, even though the restrictions may be "necessarily arbitrary." McLain II, 851 F.2d at 1050 (internal quotation marks omitted). When this is the case, our inquiry evolves from strict and exacting scrutiny into "one of reasonableness: Do the challenged laws freeze the status quo by effectively barring all candidates other than those of the major parties." Id.

## 1. Undue Burden

For a ballot access restriction to be found unconstitutional, a challenger first must establish that the law imposes a substantial burden. McLain II, 851 F.2d at 1049. North Dakota Century Code § 16.1-11-36 limits candidates' access to the

general ballot, which affects both the "right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams, 393 U.S. at 30; Libertarian Party v. Bond, 764 F.2d 538, 541 (8th Cir. 1985). "These rights rank among our most precious freedoms," Libertarian Party, 764 F.2d at 541, and are thus protected against federal encroachment by the First Amendment and state infringement by the Fourteenth Amendment, Williams, 393 U.S. at 30-31. The Supreme Court has emphasized the fundamental nature of these rights: "'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.'" Id. at 30 (quoting Wesberry v. Sanders, 376 U.S. 1, 17 (1964)). Consequently, we conclude N.D.C.C. § 16.1-11-36 imposes a substantial burden on the LPND and candidates' First and Fourteenth Amendment rights by restricting their access to the general elections ballot.

However, this substantial burden is not necessarily undue or excessive. An undue burden, which essentially removes all realistic chance for a minor party or independent candidate to ever access the general election ballot, cannot be justified by any state interest, regardless of how compelling the interest may be. Am. Party of Tex., 415 U.S. at 787-88; MacBride v. Exon, 558 F.2d 443, 449 (8th Cir. 1977). Thus, a ballot access statute imposing an undue burden is necessarily unconstitutional. In alleging N.D.C.C. § 16.1-11.36 is unduly burdensome, the LPND and candidates focus not on the requirement for "candidates [to] show a 'modicum' of support prior to their placement on the ballot." Appellant's Br. at 10. Instead, they specifically challenge as undue and excessive the percentage of support they are required to show under the statute. Id. ("[T]he issue in this case is whether the modicum of support that Section 16.1-11-36 actually requires—more than 15 percent of the eligible pool for some candidates—is constitutional.").

The Supreme Court often focuses on the amount of support a candidate is required to show when determining whether a ballot access restriction is constitutional, specifically considering the percentage of signatures or votes required. See, e.g., Munro v. Socialist Workers Party, 479 U.S 189, 190 (1986) (holding as constitutional a 1% vote requirement in a blanket primary); Am. Party of Tex., 415 U.S. at 774-75, 783 (holding a 1% signature requirement as "within the outer boundaries of support the State may require before affording political parties ballot position"); Jenness v. Fortson, 403 U.S. 431, 432 (1971) (holding a 5% signature requirement constitutional because it "in no way freezes the status quo"); Williams, 393 U.S. at 24-26 (holding a 15% signature requirement unconstitutional because it eliminated any realistic chance of a third party accessing the ballot, effectively freezing the two-party status quo). Significantly, though, the Supreme Court does not merely consider the percentage stated in a challenged law. Rather, it determines the percentage of support based on the "eligible pool." See Storer, 415 U.S. at 739. In Storer, the statute required candidates to receive signatures totaling 5% of the number of votes cast in the previous general election. However, candidates could only receive signatures from those who had not voted in the primary or signed petitions for any other party. Id. at 727-28. While the 5% requirement did not appear to be excessive on its face, the Court found it unclear on the record whether the "eligible pool" was so diminished by the number of people that voted in the primary as to make the signature requirement impractical. Id. at 739. Thus, the Court remanded the case for further fact finding so the lower court could determine the exact percent of the "eligible pool" required for the independent candidates, and noted concern if the percent was found to be substantially more than 5%. Id.

The LPND and candidates cite Storer to implore this court to ignore the plain language of N.D.C.C. § 16.1-11-36 requiring a vote total equal to 1% of the general population in the primary election, and ask us to look instead at the percentage in terms of actual votes cast in the primary election. With regard to the numbers from the 2010 election, a candidate receiving votes equal to 1% of the general population

is equivalent to the candidate receiving as high as 15% of actual votes cast in the primary. While we heed the LPND and candidates' caution as to relying solely on the 1% figure stated in the statute, we are not persuaded the correct consideration is the percent of actual votes cast. Essentially, the LPND and candidates asks us to define the "eligible pool" in a way unsupported by precedent.

In Storer, the Supreme Court looked beyond the plain language of the statute and attempted to reconcile whether a requirement for signatures equal to 5% of the number of votes cast in the previous gubernatorial election remained reasonable when converted to a percentage of the eligible pool. 415 U.S. at 739. Because voters were limited to either voting in a primary or signing one nominating petition, an independent candidate did not have access to all persons who voted in the previous election and instead had to work with the remaining persons who did not vote in the primary. Id. This eligible pool in Storer was consequently defined as those who were available to sign a petition after the primary elections were concluded. Id. Notably, the eligible pool in Storer was not based on the number of people who actually signed petitions following the primaries. Equally so, in the present case, we see no reason to define the eligible pool as those who voted in the actual primary. Instead, as was the case in Storer, the eligible pool should be the number of people who were *eligible* to vote for the candidates in the primary regardless of whether they cast a vote or not, not the number who *actually* voted.

The number of people eligible to vote in the primary election is not in the record, but Secretary Jaeger provides some evidence estimating that number to be about 75% of the general population, which in turn means the vote requirement of 1% of the general population would become 1.33% of the eligible pool of adults who can vote—a percent still well below the upper threshold of reasonable under Supreme Court precedent. Even more, considering this is an as applied challenge, even if the eligible pool was the number of actual primary voters, none of the candidates received 1% of actual votes cast: Passa received 0.24%, Stewart received 0.20% and

Ames received 0.86%. Thus, regardless of which "eligible pool" the court uses, these three candidates still have failed to show any indication of a modicum of support entitling them access to the general ballot. As Secretary Jaeger stated in his brief, "not only did the plaintiff candidates not receive the number of votes equal to 1% of the <u>population</u> of their legislative districts, and not only did they not receive the number of votes equal to 1% of the number of <u>eligible</u> voters in their legislative districts, they did not even receive 1% of the <u>actual</u> votes cast." Appellee's Br. at 20.

The LPND and candidates also attempt to demonstrate that regardless of which eligible pool is relied upon, N.D.C.C. § 16.1-11-36 creates an unrealistic burden for minor parties because no minor party candidate has been included on the general election ballot for a state legislature position since 1976. This information could certainly be concerning, but in this case, the LPND and candidates have failed to tie the absence of minor party candidates to the challenged statute or its requiring candidates to show a modicum of support during the primary election. The mere fact such candidates have been absent from the general election ballot does not, alone, prove the unconstitutionality of the statute. As Secretary Jaeger observed, the historical absence of minor parties on ballots has not been shown to be directly attributable to this statute, because it could instead be from any one of the other hurdles a party and candidate must overcome in North Dakota's election scheme to be placed on the general ballot. Because the LPND and candidates have failed to provide evidence of any other minor party candidates who have been placed on the primary ballot but have failed to meet the challenged statute's 1% requirement for reaching the general ballot, we are unpersuaded by the mere absence of minor party candidates on the ballot. There is no historical evidence N.D.C.C. § 16.1-11-36 has prevented any candidate from reaching the general ballot by imposing an insurmountable and undue burden.

For these reasons, we conclude N.D.C.C. § 16.1-11-36 imposes a substantial, but not undue or excessive, burden on the LPND and candidates' First and Fourteenth Amendment rights.

## 2. State's Interest

To justify this substantial but not undue burden, Secretary Jaeger contends N.D.C.C. § 16.1-11-36 is necessary to prevent ballot overcrowding and voter confusion by eliminating frivolous candidates, among other interests. A substantial but not undue burden may be constitutional so long as it is necessary to achieve a compelling state interest. McLain II, 851 F.2d at 1049. "'[O]nly a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.'" Williams, 393 U.S. at 31 (quoting NAACP v. Button, 371 U.S. 415, 438 (1963)). A state has a compelling interest in "'protecting the integrity of their political processes from frivolous or fraudulent candidacies, in insuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections.'" Libertarian Party, 764 F.2d at 540-41 (quoting Clements v. Fashing, 457 U.S. 957, 965 (1982)). Consequently, a state has a legitimate interest in regulating the number of candidates on the ballot in order to "prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections." Bullock v. Carter, 405 U.S. 134, 145 (1971). "Moreover, a [s]tate has an interest, if not a duty, to protect the integrity of its political process from frivolous or fraudulent candidacies." Id. A state's interest in eliminating frivolous candidates from the ballot is "sufficiently implicated to insist that political parties appearing on the general ballot demonstrate a significant, measurable quantum of community support." Am. Party of Tex., 415 U.S. at 782; see also Jenness, 403 U.S. at 442 ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before

printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."). Accordingly, the state's alleged interests of preventing ballot overcrowding, avoiding voter confusion caused by frivolous candidates, as well as ensuring an efficient election process and avoiding the expense associated with run-off elections are all sufficiently compelling as to justify infringing upon the rights to vote, to freely associate, and to promote political beliefs.

However, whether N.D.C.C. § 16.1-11-36 is necessary to achieve these compelling interests is a more complex analysis. As an initial matter, the LPND and candidates assert there are alternative, less burdensome means of furthering the state's compelling interest and consequently the chosen means is not necessary and must be unconstitutional. We disagree. The LPND and candidates offer as an alternative means the option of requiring 1% of the number of voters in a previous election instead of basing the percentage on the district's population. Certainly, it could be reasonable for North Dakota to do this as it is similar to the requirements upheld by the Supreme Court for other states' election laws. See, e.g., Am. Party of Tex., 415 U.S. at 782. However, the mere identification of a less burdensome alternative is not dispositive in election cases such as this one. The need for fair and orderly elections requires states to enact restrictions even though those restrictions may be "necessarily arbitrary," McLain II, 851 F.2d at 1050 (internal quotation marks omitted), and such arbitrary restrictions may include the selection of the number of signatures or votes needed to get on a general election ballot. In this case, the LPND and candidates' suggestion to use a percent of actual votes, or votes cast in a previous election, as opposed to a percentage of the general population, is really an argument about the number of votes required, an arbitrary component to the law, for which our inquiry evolves from strict and exacting scrutiny into "one of reasonableness." Id. As we previously discussed in more detail, the percentage of votes required by N.D.C.C. § 16.1-11-36 is not excessive or undue and thus we conclude requiring a number of votes equal to 1% of the population is reasonable and, therefore, constitutional

-12-

despite the existence of alternatives. See MacBride, 558 F.2d at 448 (analyzing a deadline as an arbitrary component to the law and would uphold deadline so long as it was reasonable). As the LPND and candidates concede in briefing, it has "never been in dispute in this case" that "North Dakota may enact 'reasonable' ballot access restrictions," Appellant's R. Br. at 4, and the requirement of acquiring votes equal to 1% of the general population to reach the general election ballot is reasonable under Supreme Court and Eighth Circuit precedent.

The LPND and candidates raise two additional challenges to the necessity of N.D.C.C. § 16.1-11-36 in achieving the state's alleged compelling interests. First, they contend the statute "does not serve any legitimate state purpose" because it targets candidates who already "demonstrated a significant modicum of electoral support." Appellant's R. Br. at 5. They specifically argue the statute is not necessary because "[by] its own terms, [§] 16.1-11-36 is specifically directed at candidates who 1) win their primary election races; 2) after successfully qualifying for inclusion on the primary election ballot; [and] 3) [are] of a political party that likewise successfully qualified for inclusion on the primary election ballot." Id.

In North Dakota, a candidate is placed on the primary ballot through one of two processes. First, a nonparty candidate can file a petition containing the signatures of 1% of the general population of the relevant legislative area or 300 signatures, whichever is less. The second method, which applies to candidates affiliated with a party, involves filing a certificate of nomination requesting a chosen candidate be placed on the primary ballot without the candidate first obtaining signatures. In this case, candidates Passa, Stewart, and Ames were all nominated by the LPND and thus they were placed on the primary ballot without meeting the nonparty candidate signature requirement. However, to become a party—and thus to be able to bypass the candidate signature requirement—the LPND had to obtain 7,000 signatures statewide to show sufficient party support. These 7,000 signatures could be from any

-13-

adult statewide regardless of whether the adult had signed any other party's petition and did not require the signer to commit to voting for the party in the future primaries.

The LPND and candidates contend this 7,000-signature requirement to become a party establishes sufficient voter support to justify future ballot placement of all candidates and thus obviates the need for a minimum vote requirement following the primary election. We cannot agree, particularly given the LPND and candidates chose to bring this challenge as applied. For candidates Passa, Stewart, and Ames, not one of them had to acquire signatures to show support as an individual candidate. The only evidence of support before the primary election was the 7,000 signatures acquired by the LPND to become a party. These signatures—while obtained in part by each of these candidates—were not to show support for the individual candidates, but rather for the party as a whole. At no point in the process leading up to the primary election were the voters ever provided the opportunity to show support, or lack thereof, for any specific candidate. Instead, as North Dakota's election laws require, the first point at which these candidates' voter support was demonstrated was at the primary election itself. Accordingly, N.D.C.C. § 16.1-11-36 is not obviated by the process of getting onto the primary election ballot. To the contrary, given the ease with which a candidate may be placed on the primary ballot, the primary election becomes the first instance to filter candidates by actual voter support. Further, the necessity of the lesser of 1% or 300 primary vote requirement becomes even more evident when considering the fact that the 7,000 signature requirement on which the LPND and candidates rely as their showing of support is a one-time occurrence. Once a party is established using the 7,000 signatures, it will not have to regain those signatures in future years. Instead, the only protection the state has from frivolous party candidates and ballot overcrowding in subsequent elections is the 1% or 300 vote requirement in the primaries. And, as addressed in more detail above, it was at these primaries that candidates Passa, Stewart, and Ames failed to generate sufficient support to establish themselves as viable, nonfrivolous candidates. We therefore are unpersuaded by the LPND and candidates' contention as to § 16.1-11-36 being

-14-

unnecessary because we cannot agree the candidates had already demonstrated a sufficient modicum of support.

Second, the LPND and candidates challenge the state's reliance on primary elections as the forum for determining the amount of support for a particular candidate. The LPND and candidates contend primary elections "are an inherently *inaccurate* measure of support for minor party candidates" because primary elections are notorious for low voter turn out, voters are limited to voting within only one party at the primary, and the elections take place too early in the campaign process "before voters can possibly know who the major party nominees are, must less register dissatisfaction with them." Appellant's R. Br. at 7. We are unpersuaded by each of these contentions. To begin, the LPND and candidates' argument as to low voter turn out is without merit as it has already been rejected by the United States Supreme Court in Munro, 479 U.S. at 198. The Supreme Court stated, "We perceive no more force to this argument than we would with an argument by a losing candidate that his supporters' constitutional rights were infringed by their failure to participate in the election." It further explained,

> "candidates and members of small or newly formed political organizations are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. . . ." States are not burdened with a constitutional imperative to reduce voter apathy or to 'handicap' an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot.

Id. (quoting Jenness, 403 U.S. at 438). It is relevant that just as major parties are able to do, minor parties can campaign and reach out to the electorate for support leading up to the primary. Am. Party of Tex., 415 U.S. at 785. Thus, despite the traditionally lower interest in primary elections than general elections, the burden is appropriately placed on the candidate to generate support and rally voters to vote in order to make

-15-

it to the general election ballot. It is not the state's obligation to find or create an easier forum for establishing voter support.

Similarly, we are unpersuaded by the LPND and candidates' frustration with the restriction created by N.D.C.C. § 16.1-11-22 which limits voters to voting only within a single party's primary election. The LPND and candidates claim this limitation makes it more difficult for smaller third parties to attract a significant number of voters when the two major parties likely have more contentious and more nationally-relevant elections on their ballots. The Supreme Court has indicated such a limitation is reasonable and constitutional for states to impose, Am. Party of Tex., 415 U.S. at 785, but as the LPND and candidates aptly point out, this rule creates a potential disadvantage for third parties in generating voter support at the primaries because a voter who is interested in a particular, nationally-relevant campaign might desire to vote for a major party candidate in one seat and thereby foreclose the opportunity to vote for a third party candidate in a state legislature position. Nevertheless, the fact that voters are limited to voting within only one party at the primary election is not fatal to the ballot access restriction created in N.D.C.C. § 16.1-11-36. The purpose of the primary election is for voters to indicate support for a desirous candidate. Parties are responsible for campaigning and generating voter support leading up to the primary election. Munro, 479 U.S. at 197-98. The candidates had the responsibility of rallying the voters to come to the primary to generate the necessary support to reach the general election ballot. Id. As the Supreme Court has explained, states are permitted to require candidates "through their ability to secure votes at the primary election, [to demonstrate] they enjoy a modicum of community support in order to advance to the general election." Id. The fact the candidates in this case failed to generate this support shows N.D.C.C. § 16.1-11-36 performed precisely the function the state intended to further: its compelling interest of eliminating frivolous and unsupported candidates from the ballot. See id. at 198 ("[R]equiring candidates to demonstrate such support [at a primary] is precisely what we have held States are permitted to do."). Consequently, we

-16-

conclude the limitation of voting only within a single party's primary election does not render primary elections an unconstitutional forum for evaluating a candidate's modicum of support.

The LPND and candidates' last challenge is to the timing of the primary election. They suggest primary elections are held at a time before minor parties and independent candidates are likely to generate support and therefore places third parties at an unconstitutional disadvantage. The courts have recognized the "disaffected" group of voters likely to support candidates outside of the two major parties may not be cohesive or identifiable until a few months before the election because "the identity of the likely major party nominees may not be known until shortly before the election." Williams, 393 U.S. at 33. We have emphasized that minor parties and independent candidates often face greater difficulties in generating voter support too early in the campaigning process: "[W]ithin the framework of organized political parties, most voters in fact look to third party alternatives only when they have become dissatisfied with the platforms and candidates put forward by the established political parties. This dissatisfaction often will not crystalize until party nominees are known." McLain II, 637 F.2d at 1164; see also MacBride, 558 F.2d at 449 ("The American political system is basically the two-party system with which all are familiar, and ordinarily popular dissatisfaction with the functioning of that system sufficient to produce third party movements and independent candidacies does not manifest itself until after the major parties have adopted their platforms and nominated their candidates."). Consequently, a deadline for showing support which is too early may be an arbitrary restriction precluding third party candidates from accessing a general election ballot. See MacBride, 558 F.2d at 448 (rejecting as arbitrary a deadline for party signature requirements nine months before general election and ninety days before primary election).

We have nevertheless upheld deadlines for showing voter support as early as one week before a primary election, Libertarian Party, 764 F.2d at 542, and the

Supreme Court has upheld deadlines occurring even before primary elections are held. Compare Am. Party of Tex., 415 U.S. at 787 (holding deadline 120 days before election was not unreasonable or unduly burdensome) and Jenness, 403 U.S. at 433-34 (holding mid-June deadline for third party nominees, which was the same deadline as that for candidates filing in party primaries, was not unreasonably early) with Anderson, 460 U.S. at 780 (held a filing deadline 229 days in advance of general election was unconstitutional) and McLain I, 637 F.2d at 1164-65 (holding deadline for new political parties, which was 90 days before primary election, was "particularly troublesome"). Even more, the Supreme Court has upheld the use of primaries as a forum to determine whether a candidate has a modicum of support. See Munro, 479 U.S. at 197-98. We therefore conclude the LPND and candidates' concern should be rejected. The courts have acknowledged the necessity of giving third party and independent candidates an opportunity to capitalize on the disaffected group of voters created only after the major parties platform and candidates are known. However, in acknowledging that necessity, the courts have also held primaries are a reasonable basis for determining candidate support, and a deadline occurring even a week before a primary election is reasonable. Accordingly, we conclude a requirement of a showing of support at the time of a primary election is not an arbitrarily restrictive deadline and is within the bounds of reasonableness.

Because we conclude the substantial burden created by N.D.C.C. § 16.1-11-36 is reasonable and necessary to serve compelling state interests, we affirm the district court's dismissal of the LPND and candidates' challenge to the constitutionality of N.D.C.C. § 16.1-11-36 under the First and Fourteenth Amendments.

### B.  Equal Protection Challenge

We turn next to the LPND and candidates' argument as to N.D.C.C. § 16.1-11-36 violating the Equal Protection Clause. The district court rejected this argument, briefly stating it found no unequal treatment across parties because all candidates are

subject to the same 1% or 300 vote requirement to reach the general ballot. According to the LPND and candidates, the district court erred because it failed to address the disparate impact created by the statute. They argue the minor parties are essentially required to demonstrate the same level of support as the major parties, but the major parties had decades in which to build a higher level of support placing minor parties at a disadvantage.

To determine whether or not a statute violates the Equal Protection Clause, we consider "the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." Williams, 393 U.S. at 30. In analyzing the LPND and candidates' equal protection challenge, we first look at the state's interests, which are the same as those discussed above—protecting the integrity of the political process from frivolous or fraudulent candidacies, ensuring the election process is efficient, avoiding voter confusion caused by an overcrowded ballot, and avoiding the expense and burden of run-off elections. As we have already concluded, these interests of the state are not only compelling, but the statute is necessary to further those interests. Similarly, the burdens alleged by the LPND and candidates in their equal protection challenge are the same burdens alleged in their First and Fourteenth Amendment challenges discussed above—the infringement on the right of individuals to associate for the advancement of political beliefs and on the right to cast votes effectively regardless of political persuasion. As concluded above, these burdens are substantial, but not undue or excessive.

However, in the context of equal protection, we engage in further considerations, namely whether the law disadvantages one group over another so as to result in unequal treatment and whether this unequal treatment is justified by a compelling interest. See id. ("We have . . . held many times that 'invidious' distinctions cannot be enacted without a violation of the Equal Protection Clause."). We agree with the district court's conclusion as to no unequal treatment being present

-19-

in this case. On its face, N.D.C.C. § 16.1-11-36 treats all candidates, regardless of party, the same. Any candidate appearing on the primary ballot will be placed on the general ballot only if he or she received the requisite number of votes required to meet the lesser of 1% of the relevant district's population or 300 votes. Nevertheless, the United States Supreme Court has previously invalidated an election law scheme despite the scheme treating all parties equally because, in application, the equal treatment had a disparate impact. Jenness, 403 U.S. 431 (citing Williams, 393 U.S. at 34). In Williams, the Supreme Court reviewed and rejected Ohio's election law scheme as a whole because it denied equal protection to minority political parties. 393 U.S. at 34. The law at issue in Williams required parties to obtain petitions signed by qualified electors totaling 15% of the number of ballots cast in the last preceding gubernatorial election in addition to complying with a slurry of more technical requirements before it could be considered a party in the subsequent election. In contrast, another law permitted those parties who received 10% of the votes in the last gubernatorial election to retain their party status for the election, avoiding the 15% signature requirement and other technical requirements. The Supreme Court determined these laws created an unequal treatment between minor and major parties. Rejecting the state's argument that the laws applied to all parties equally, the Supreme Court recognized that, in application, this scheme resulted in the two major parties consistently retaining party status and avoiding the signature requirement while minor parties on numerous occasions tried and failed to become a new party on the ballot. The Supreme Court later interpreting its holding in Williams opined: "Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in Williams v. Rhodes." Jenness, 403 U.S. at 442.

The LPND and candidates focus on that language from Jenness to highlight the inequalities they allege are created by N.D.C.C. § 16.1-11-36 in application, namely, minor and major parties each complying with a requirement more easily met by major parties. However, we view the situation in Williams as significantly different from

-20-

the statutory scheme in North Dakota. For instance, in <u>Williams</u>, the major parties were essentially never subject to the 15% signature requirement or any of the other more technical and nuanced requirements because those parties consistently retained 10% of the votes cast in the previous election. 393 U.S. at 25-26. By comparison, minor parties were required to meet new party requirements in Ohio's attempt "to keep minority parties and independent candidates off the ballot." 393 U.S. at 26. In fact, one of the minor parties in <u>Williams</u> had achieved the 15% signature requirement, but was still denied access to the ballot due to the failure to meet other technical requirements. 393 U.S. at 26-27. By contrast, under North Dakota's election scheme, all parties are subject to the same 1% or 300 vote requirement in the primaries regardless of support shown in a prior year's election. Further, the requirement is fairly minimal—compare 15% to 1%. In contrast to the law in <u>Williams</u>, North Dakota's ballot access restriction not only treats each party equally on the face of the law, it also treats each party equal in application. We see no unequal effects sufficient to sustain an equal protection challenge.

Nevertheless, the LPND and candidates further their argument with one additional point: the fact that no third party candidate has appeared on the state legislature ballots since 1976. Assuming the facts as true—as this court should on a motion to dismiss for failure to state a claim—this fact could be damaging to the constitutionality of the statute. As the Supreme Court has stated, "it will be one thing if [minor party] candidates have qualified with some regularity and quite a different matter if they have not." <u>Storer</u>, 415 U.S. at 742. A disparate impact that "operate[s] to freeze the political status quo" to a two-party system violates the Equal Protection Clause. <u>Jenness</u>, 403 U.S. at 438. However, as discussed above as well, the claims made by the LPND and candidates in their complaint do not establish N.D.C.C. § 16.1-11-36 as the cause of minor parties' absence on general election ballots. There are no facts indicating minor party candidates have appeared consistently on the primary election ballot but are denied access to the general ballot based on the required showing of support under the challenged statute. Accordingly, we fail to see

-21-

how the mere absence of minor parties from the general election ballot, without a causal connection, necessarily establishes N.D.C.C. § 16.1-11-36 has an unconstitutional disparate impact.

IV

We conclude the burden imposed by the statute is not undue or excessive and the state has a compelling interest in having a minimum vote requirement before a candidate may appear on the general election ballot. We therefore hold N.D.C.C. § 16.1-11-36 is not unconstitutional on First or Fourteenth Amendment grounds. Furthermore, because the law applies equally to all candidates and does not result in unequal treatment, we hold the statute does not violate the Equal Protection Clause. Accordingly, we affirm the district court.

_____