# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2503
_____

Libertarian Party of Arkansas; Sandra Chaney Richter; Michael Pakko; Ricky Harrington, Jr.; Christopher Olson; Michael Kalagias

*Plaintiffs - Appellees*

v.

John Thurston, in his official capacity as Secretary of State for the State of Arkansas

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: December 11, 2019
Filed: June 18, 2020

_____

Before ERICKSON, MELLOY, and KOBES, Circuit Judges.

_____

MELLOY, Circuit Judge.

In Arkansas, new political parties may petition to appear on the next general-election ballot on a whole-ballot basis—with candidates listed for each elected office but without meeting individual office-by-office petitioning requirements. Arkansas recently amended its laws to make the petition requirements for whole-ballot access

more demanding. See 2019 Ark. Acts 164, § 1. The recent amendments moved the petition deadline farther from the general election and increased the number of signatures required. The Libertarian Party of Arkansas ("Libertarian Party" or "Party") and several of its members brought suit challenging the petition requirements and seeking preliminary and permanent injunctive relief.

The district court[1] found the current petition requirements likely to be unconstitutional and otherwise found the Libertarian Party entitled to preliminary relief. Although the district court found a deadline far from the election to be the most problematic aspect of the current petition requirements, the grant of preliminary injunctive relief did not amend deadlines. Rather, the district court stated that any court-imposed changes to the deadlines would be too great an exercise in judicial legislation and would likely carry unintended consequences. As a result, the district court ordered the Secretary of State to accept a timely petition with a number of signatures equal to or greater than required under prior law. The Arkansas Secretary of State appeals, arguing the district court (1) erred in concluding the Libertarian Party was likely to prevail on the merits, (2) abused its discretion in otherwise determining preliminary injunctive relief was appropriate, and (3) abused its discretion in tailoring relief to the signature requirement when the court's primary concern had been the statutory deadline. We affirm.

I.

The current Arkansas statutes governing political parties' petitions to register for whole-ballot access impose three requirements that the Libertarian Party challenges as a collectively unconstitutional burden: (1) a numerosity or "modicum-

_____

[1]The Honorable Kristine G. Baker, United States District Judge for the Eastern District of Arkansas.

of-support" signature requirement; (2) a limited, rolling window for collecting signatures; and (3) a deadline for submission.

First, for the 2020 election ballot, Arkansas requires signatures from approximately 27,000 registered Arkansas voters. See Ark. Code Ann. § 7-7-205(a)(2). Arkansas phrases the current requirement as a percentage of the total votes cast in the last gubernatorial election—3%. The parties agree that, based on votes cast in the last election, this 3% figure amounts to roughly 27,000 signatures. Because only about half of registered voters actually voted in that last election, the current 3% figure translates to about 1.5% of the total number of registered voters in Arkansas. In contrast to the current statute, the prior signature requirement was a fixed number (10,000) rather than a percentage of voters in a reference election. 2007 Ark. Acts 821, § 1. Neither the current nor the prior versions of the statute restrict the number of petitions an individual voter may sign nor place geographic limits as to where in the state the petition-signing voters must reside.

Second, signatures older than ninety days may not be counted. Accordingly, the petitioning party must strategically time its canvassing efforts to obtain a viable, rolling 90-day window, submitting its petition at the end of that window. See Ark. Code Ann. § 7-7-205(a)(4)(B).

Third, signatures must be submitted approximately 425 days prior to the general election. See Ark. Code Ann. § 7-7-205(a)(6). The statute defines this due date through references to statutory dates material to the primary process for existing, recognized major parties. For example, Arkansas Code Section 7-7-205(a)(6) sets the petition due date as 60 days before the "party filing period." Section 7-7-203(c)(1), in turn, sets the "party filing period" as a seven day window beginning at noon on the first Monday in November of the year preceding the general election. Prior to the February 2019 statutory amendments, the "party filing period" was in March of the election year rather than in November prior to the election year. See Ark. Code Ann.

-3-

§ 7-7-203(c)(1) (2018). As such, the recent amendment effectively moved the petition deadline more than 120 days farther away from the general election.

The "party filing period" is a window for established parties to file for access to state funding for their party primaries held in March and June of the election year. See id. § 7-7-201(a) (state funding). Importantly, parties seeking whole-ballot access via petition do not participate in primaries. Rather, if a new political party is recognized by successful petitioning, that new party nominates its candidates by convention and is required to submit its convention-selected nominees, id. § 7-7-205(c)(2)(A), to the Secretary of State on the day of the established parties' preferential primary elections, i.e., "on the first Tuesday after the First Monday in March," id. § 7-7-203(b)(2). In this way, the deadlines for minor parties to petition for access and select candidates are tethered to and defined by deadlines for major-party primaries, even though the petitioning minor parties are not involved in such primaries. Arkansas asserts that the recent changes to the Arkansas primary schedule and filing requirements were based at least in part on a desire for Arkansas to hold its partisan primaries on the national Super Tuesday primary date along with several other states.

Several additional Arkansas statutory provisions are relevant to the present case. First, a political party may be recognized without the need for a new petition if that party successfully petitions for an election and then earns 3% of the vote in the actual election for governor or president. Id. §§ 7-1-101(27)(A), 7-7-205(c)(4). A party that succeeds at the alternative path of obtaining 3% of the vote does not select its candidates through a convention. Rather, such a party may receive state funds for conducting a primary. Id. Second, independent candidates may petition to be placed on the ballot for a particular local office with the lesser of 2,000 signatures or 3% of the "qualified electors in the county, township, or district" for which office is sought. Id. § 7-7-103(b)(1)(A). For state office or the United States Senate, independent candidates need the lesser of 10,000 signatures or "3% of the qualified electors of the

state." Id. § 7-7-103(b)(1)(B). Finally, political parties who do not seek whole-ballot access, but only seek to place a candidate on the ballot for president or vice president, may petition for such access with the signatures of 1,000 registered Arkansas voters. Id. § 7-8-302(5)(B).

Turning to the facts at hand, the chair of the Libertarian Party in Arkansas lobbied the legislature in Arkansas arguing against the recent statutory changes. After failing to stop passage of the amendments, the Libertarian Party began collecting signatures and also filed suit to challenge the amended requirements. By the time of the preliminary injunction hearing, the Party had obtained signatures that, with an assumed rate of validity similar to what the Party's canvassers had obtained in past efforts, the Party believed to be in excess of 10,000 valid signatures.[2]

At the preliminary injunction hearing, the Party offered an affidavit from a purported expert on minor political parties and testimony from several witnesses: the Party chair, a former Party candidate, and the Party vice chair. The district court denied a motion to exclude the affidavit, and the affidavit largely discussed a history of ballot-law changes in Arkansas and parties' success or failure under different iterations of those laws. The State offered testimony from a professional canvassing consultant, a staff attorney at the Secretary of State's office, and a political science professor. The Plaintiffs' expert's affidavit was largely consistent with testimony from the State's witnesses.

_____

[2]Ultimately, after the district court entered its order in the present case, the Libertarian Party was able to obtain approximately 18,700 signatures. The Secretary of State initially certified the petition as containing 12,749 valid signatures. This number was identical to the number the Secretary of State had certified for the Libertarian Party's petition as submitted in an effort to gain whole-ballot access in a prior election. The Libertarian Party noted this fact as suspicious, and the Secretary of State amended its certification, stating that the current petition included 14,779 valid signatures.

The Party chair testified generally about difficulties with obtaining 27,000 signatures. He discussed voters' disinterest in politics at times far removed from an election, the relative merits of canvassing when colleges were in session as contrasted with the summer months, and the cost of past petition drives (always in excess of $30,000). The Party chair stated the Party could not meet the new level of signatures in the time required without additional financial input and greatly increased canvassing efforts. He testified that, as canvassers are required to work faster, the validity rate for signatures decreases, and the Party's past petition signature validity rates had been around 75%. The Party had successfully obtained the required 10,000 signatures in 2012, 2014, 2016, and 2018. In addition, the Party had gained increasing but still small percentages of votes for statewide offices, including 2.9% of the vote for governor in the last election, just 0.1% shy of the retention requirement that would eliminate the need to petition for party status.

The prior Libertarian Party candidate described various difficulties with canvassing, including voter disinterest and event planners' disinterest at times far removed from elections. He also stated the Party was funded by many small donations and likely could not garner the financial support needed to meet the new requirements. Finally, he indicated the Party's resources are largely spent on canvassing and ballot access fights, leaving little funding for recruiting candidates or actual campaigning. The vice chair offered testimony consistent with the other Party witnesses.

The Party's expert's affidavit described minor parties' experience under prior Arkansas statutes. Between 1971 and 1977 petitions for whole-ballot access in Arkansas required signatures equal to 7% of the votes in the last gubernatorial election. Under that 7% requirement, no new party qualified by petition. Between 1977 and 2007, the petition requirement was lower: signatures equal in number to 3% of the votes cast in the last gubernatorial election with a 150 day window for collecting signatures. Under that 3% requirement, no new party qualified without

court intervention. During that same time, independent candidates could petition to be placed on the ballot for a statewide office with 10,000 signatures, and only two candidates qualified.[3] Finally, from 2007 to 2018 Arkansas statutes provided a 10,000 signature petition requirement for parties seeking whole-ballot access. Under the 10,000 signature requirement, two elections included two petitioning parties and the rest included only one: the Green Party qualified by petition in 2008, 2010, 2012, and 2014, and the Libertarian Party qualified in 2012, 2014, 2016, and 2018. Neither the Green Party nor the Libertarian Party obtained the necessary 3% in election voting to qualify for automatic whole-ballot access through any of these several elections. And, as noted above, under the prior statutes with these lower signature requirements, the deadline for submitting petitions was generally 120 days or more closer to the general election than the current requirement.

The State's consultant referenced canvassing and petition efforts in Arkansas and in other states for various ballot initiatives and referenda, citing numbers of signatures obtained and time frames involved. She consistently described referendum and ballot-initiative campaigns involving greater numbers of signatures than the numbers at issue in the present case. She described professional canvassers as less expensive at times far removed from elections. She also described various methods of combining professional and volunteer canvassers in Arkansas to meet the current requirements at a cost of $55,000 to $100,000. The Secretary of State staff attorney,

---

[3]Between 1980 and 1996, for the office of president only, Arkansas removed petition restrictions. This absence of restrictions resulted in ballots with increased numbers of presidential candidates between 1980 to 1996 as follows: 7, 10, 6, 13, 13. The parties agree these numbers represented an "overcrowded" ballot for the office of president. In response Arkansas passed the above-referenced 1,000 signature requirement to be placed on the ballot as a presidential candidate. After the imposition of this minimal requirement, the number of candidates on the ballot for president fell to a level neither party characterizes as overcrowded.

consistent with Plaintiffs' expert's affidavit, described third parties' success or failures in gaining ballot access under the older Arkansas requirements.

The State's political science professor explained Arkansas election law. He also described studies performed in Alabama and Tennessee and asserted the studies showed that vote share did not change for minor candidates regardless of whether they were independent or affiliated with a minor party. Importantly, when asked if a ballot was overcrowded due to the presence of three or four parties the professor answered that, no, such a ballot would not be overcrowded. The professor stated that having a Democrat, a Republican, and a Libertarian on a ballot would not create overcrowding.

After the hearing, the district court entered a written order granting preliminary injunctive relief. The court applied Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109 (8th Cir. 1981) (en banc), employing the higher threshold for a likelihood of success on the merits as required for challenges to duly enacted state laws. See Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 725, 732 (8th Cir. 2008). The court noted that a sliding scale of deference applies to ballot access review under the First and Fourteenth Amendments, with deferential review applying unless the statutes at issue impose "a burden of some substance" on the plaintiffs. See Moore v. Martin, 854 F.3d 1021, 1026 (8th Cir. 2017). If such a burden exists, a form of strict scrutiny applies and requires that the statute be "narrowly drawn to serve a compelling state interest." Id. (quoting Libertarian Party of N.D. v. Jaeger, 659 F.3d 687, 693 (8th Cir. 2011)).

The court addressed a history of court challenges to ballot access laws in Arkansas, starting with several district court cases that did not involve appeals. The district court noted that these cases generally suggested that a 10,000 signature requirement was permissible but a 3% requirement coupled with a deadline in January of an election year was not. See, e.g., Citizens to Establish a Reform Party in Ark. v.

Priest, 970 F. Supp. 690, 699 (E.D. Ark. 1996). The court next turned to Eighth Circuit and Supreme Court cases, compared them to the currently challenged statutory requirements, and found the current requirements imposed a severe burden such that strict scrutiny applied.

The court then described the parties' evidence, finding that the Libertarian Party had demonstrated a likelihood that they could not meet the current requirements. The court discounted the testimony of the State's expert consultant regarding the feasibility of meeting the current requirements because the past efforts she described had involved different states, different time frames, different or non-disclosed budgets, or had dealt with referenda on issues with high levels of voter interest. The court also found that the State's expert's discussion concerning what the Libertarian Party might do in terms of hired canvassers and volunteers was unrealistic.

Next, the court noted that the State had failed to identify a compelling state interest. The court nevertheless suggested several potential interests, finding the current statute was not narrowly tailored to any of these hypothetical interests. In particular, the court noted: the absence of any cognizable problem with ballot crowding in Arkansas; the effectiveness of the prior, less restrictive versions of the statutes at limiting minor party involvement; and the arbitrariness of the new changes. Referencing the State's assertion that the statutory amendments were designed to place primaries on Super Tuesday, the court noted that it would be a "non-sequitur" to claim that the desire to move existing parties' primaries served as a compelling interest for the new statutory requirements because petitioning parties are not involved in primaries.

Finally, the court addressed the balance of the Dataphase factors (irreparable harm, balance of harms, public interest) and found an injunction was appropriate. In fashioning the preliminary injunction to address the number of signatures rather than

the statutory deadline, the court restated the three challenged provisions that collectively served to "severely burden" Plaintiffs' rights. The court noted that "[t]he enjoinment of any *one* of these elements would somewhat reduce the burdens placed upon plaintiffs' constitutional rights." Ultimately, the court ordered the Secretary of State to accept a petition from the Libertarian Party if it contained 10,000 signatures and otherwise satisfied the balance of the statutory requirements, stating: "The Court declines at this stage of the proceeding to alter the deadlines for submitting new party petitions or the party filing deadline, as such changes might unintentionally affect the complex primary calendar in the State of Arkansas."

II.

"Ballot access restrictions implicate . . . the rights of potential candidates for public office . . . [and] the First and Fourteenth Amendment rights of voters to cast their ballots for a candidate of their choice and to associate for the purpose of advancing their political beliefs." Moore, 854 F.3d at 1025. If a statute restricting ballot access imposes "a burden of some substance on a plaintiff's rights" we apply a form of strict scrutiny and uphold the statute "only if it is 'narrowly drawn to serve a compelling interest.'" Id. at 1026 (quoting Jaeger, 659 F.3d at 693); Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) ("Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest."). Because states enjoy broad regulatory power over the election process, however, "[l]esser burdens . . . trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" Timmons, 520 U.S. at 358 (quoting Burdick v. Takushi, 504 U.S. 428, 434 (1992)).

In this appeal from a grant of preliminary injunctive relief enjoining the enforcement of state statute, Dataphase and Rounds govern our review. Dataphase requires courts to analyze and balance "(1) the threat of irreparable harm to

[Plaintiffs]; (2) the state of the balance between this harm and the injury that granting the injunction [would] inflict on [Arkansas]; (3) the probability that [Plaintiffs would] succeed on the merits; and (4) the public interest." Dataphase, 640 F.2d at 113. Under the third factor, "parties seeking to preliminarily enjoin the 'implementation of a state statute' must demonstrate that they are 'likely to prevail on the merits.'" Rodgers v. Bryant, 942 F.3d 451, 455 (8th Cir. 2019) (quoting Rounds, 530 F.3d at 731–32)). This heightened standard "reflects the idea that governmental policies implemented through legislation . . . [and] developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Id. at 455–56 (alteration in original) (citation omitted). Generally, if a party shows a "likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are . . . deemed to have been satisfied." Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (citation omitted). Overall, we review a district court's balancing of the Dataphase factors and the manner of relief granted for an abuse of discretion. Rounds, 530 F.3d at 733; Novus Franchising v. Dawson, 725 F.3d 885, 893 (8th Cir. 2013) ("A district court has broad discretion when ruling on a request for preliminary injunction, and it will be reversed only for clearly erroneous factual determinations, an error of law, or an abuse of its discretion." (citation omitted)).

To address the likelihood of success on the merits, we compare the current Arkansas petition requirements to requirements the Supreme Court and the Eighth Circuit have addressed previously. This analysis is necessary to determine what these courts deem to be substantial burdens (as relevant to determining whether strict scrutiny applies). This analysis is also relevant to the ultimate question of a likelihood of success on the merits.

The questions we face, however, do not call for a mere mechanical comparison of numbers and dates. Anderson v. Celebrezze, 460 U.S. 780, 789 (1983) ("Constitutional challenges to specific provisions of a State's election laws . . . cannot

-11-

be resolved by any litmus-paper test . . . ."). Rather several additional non-numerical factors also guide our analysis. First, some restrictions are acceptable, both in terms of numerosity and deadlines, even if those restrictions favor the two-party system. Timmons, 520 U.S. at 367. Second, no one factor stands alone; rather, requirements must be viewed collectively to assess the overall burden. Green Party of Ark. v. Martin, 649 F.3d 675, 684 (8th Cir. 2011); Libertarian Party v. Bond, 764 F.2d 538, 541 (8th Cir. 1985). Third, parties' past success or failure in a particular state under extant or prior requirements is relevant to show the necessity or burdensomeness of the restrictions, and such history is also material to the question of whether the statutes are narrowly tailored to a compelling state interest. Storer v. Brown, 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not."); Martin, 649 F.3d at 684. Fourth, the availability of alternative paths to party certification should be considered. Martin, 649 F.3d at 687. Fifth, the lack or presence of geographic restrictions on the signature pool is relevant as is the ability of voters to sign multiple petitions and sign petitions without pledging votes. McLain v. Meier, 851 F.2d 1045, 1049 (8th Cir. 1988) ("McLain II"). Sixth, the existence of similar or different restrictions on petitioning requirements for party access, independent access, ballot initiative access, or constitutional amendment access are relevant, in part, when assessing whether restrictions are narrowly drawn, but differences permissibly may exist between these schemes given the differences underlying the efforts in each area. See, e.g., Storer, 415 U.S. at 745 ("[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."); Moore, 854 F.3d at 1025 ("Ballot access restrictions implicate not only the rights of potential candidates . . . but also the First and Fourteenth Amendment rights of voters to . . . associate for the purpose of advancing their political beliefs."). And seventh, the existence of provisions that allow a party to register for individual races, or that allow individuals to run as independents rather than as party members, do not relieve the state of its burden to make restrictions on whole-ballot party access

-12-

reasonable. <u>McLain v. Meier</u>, 637 F.2d 1159, 1165 (1980) ("<u>McLain I</u>") ("A candidate who wishes to be a party candidate should not be compelled to adopt independent status in order to participate in the electoral process.").

Finally, deadlines far before election day are problematic because of the general disinterest of potential voters so far removed from elections. <u>Id.</u> at 1164 ("[M]ost voters in fact look to third party alternatives only when they have become dissatisfied with the platforms and candidates put forward by the established political parties. This dissatisfaction often will not crystalize until party nominees are known. . . . [I]t is important that voters be permitted to express their support for independent and new party candidates during the time of the major parties' campaigning and for some time after the selection of candidates by party primary."). Early filing deadlines pose heavy burdens on minor parties and independent candidates, in part, because they are likely to impact the ability of parties or independent candidates to procure signatures. <u>See</u> <u>Andersen</u>, 460 U.S. at 791–92 ("An early filing deadline may have a substantial impact on independent-minded voters. . . . [I]ssues simply do not remain static over time. . . . It also burdens the signature-gathering efforts of independents who decide to run in time to meet the deadline. When the primary campaigns are far in the future and the election itself is even more remote, the obstacles facing an independent candidate's organizing efforts are compounded. Volunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign.").

In general, petition deadlines earlier than spring of election year are problematic even when coupled with a generally permissible 10,000 signature requirement. By comparison, Arkansas's present requirement for 27,000 signatures, 425 days prior to the election and with a rolling 90 day window to obtain the signatures sets a much higher bar.

The parties dispute the importance of numerical guideposts as found in Supreme Court and Eighth Circuit cases. The Supreme Court in Williams v. Rhodes held a new-party petitioning regime was unconstitutional based on a deadline of February in the election year (approximately 250 days prior to election) with a numerosity requirement equal in number to 15% of the votes cast in the prior gubernatorial election. 393 U.S. 23, 25–26 (1968). Then, in Jenness v. Fortson, the Court approved as constitutional a Georgia independent-candidate petition requirement that demanded a "petition signed by at least 5% of the number of registered voters at the last general election," 403 U.S. 431, 432 (1971), by a deadline approximately 180 days prior to the general election with a 180 day window permitted for collecting signatures, id. at 432–34. More recently in Anderson, the Court held an independent-candidate petition requirement unconstitutional even though the laws at issue required only 5,000 signatures be submitted by March 20 in the election year and even though the candidate had obtained far more signatures than required. 460 U.S. at 782–83 & n.1.

The value and importance of Williams in the present analysis is questionable because additional, uncommon statutory requirements were at issue in that case and the numerosity requirement was much higher than the current requirements. Jenness is significant in that the signatures required as a percentage of eligible voters was greater than in the present case, but the filing deadline was much more forgiving. The State relies heavily on Jenness noting that the current 3% requirement in the present case is "effectively" a 1.5% requirement when looking at the entire pool of eligible voters in Arkansas, as contrasted with the 5% requirement in Jenness. The State also argues the current signature requirement should be viewed favorably due to the absence of any geographic restrictions or limits on the number of petitions a voter may sign. See McLain II, 851 F.2d at 1049. The Libertarian Party counters that Anderson, coming after Williams and Jenness and requiring only 5,000 signatures by March 20, demonstrates the Court's view that pushing the signature requirement too

-14-

far back in the election year is unconstitutional even with an otherwise acceptable numerosity requirement.

Our own cases appear to comport with the Libertarian Party's interpretation of the Court's guideposts. In McLain I, we held North Dakota's new-party petition requirement unconstitutional in that it demanded 15,000 signatures (approx. 3.3% of eligible voters) by June 1 of the election year. 637 F.2d at 1161, 1165. That deadline was 90 days before that state's primary and approximately 150 days before the general election. We stated, "North Dakota's filing deadline more than ninety days in advance of the primary election impresses us as unnecessarily removed from the time of the major parties' most active campaigning. . . . Given [the] relatively high signature requirement, the North Dakota ballot access scheme in its totality is particularly questionable." Id. at 1164 (footnote omitted).

Then, in McLain II, we revisited the North Dakota regime after a legislative change. 851 F.2d at 1047. We approved as constitutional a revised statute that required only 7,000 signatures with a deadline 200 days before the general election and 55 days prior to the state's primaries. Id. There, although not striking the statute as unconstitutional, we again placed emphasis on the deadline, stating, "The most troubling aspect of these requirements is that the signatures are due more than 200 days before the November election." Id. at 1049.

Later, in Martin, our primary focus was not on Arkansas's statutory petition requirement. 649 F.3d at 679. Rather, we addressed the alternative path for a party in Arkansas to gain recognition: securing 3% of the vote in a gubernatorial election. In rejecting the Green Party's claim that the election-vote-share retention path was unconstitutional, we repeatedly emphasized the importance of alternative paths for new-party recognition and held that the retention requirement was permissible because, "[a]lternative parties not certified as a political party may secure ballot access for their entire slate of candidates by filing a petition comprised of the

-15-

signatures of 10,000 registered Arkansas voters, or roughly six-tenths of one percent of all registered Arkansas voters." Id. at 685. This "failsafe" alternative path, however, is precisely the statutory path that Arkansas now has made more demanding and that the Libertarian Party challenges. Therefore, Arkansas's recently heightened requirements for petitioning parties not only call into question the constitutionality of the petitioning requirements themselves, they call into question the continuing validity of our decision in Martin.

Finally, in Moore, we recently applied strict scrutiny to the Arkansas independent-candidate regime. 854 F.3d at 1026–27. We applied strict scrutiny based on the signature requirement coupled with what we characterized as an early deadline—the lesser of 10,000 signatures or 3% of the electorate and a deadline of March 1 of election year (approximately 250 days prior to the election). Id. at 1023. Although we concluded strict scrutiny applied, we denied summary judgment, holding a trial was required to determine whether these restrictions were narrowly drawn to satisfy a compelling state interest. Even so, a dissenting judge on the panel would have simply struck the scheme as unconstitutional. See id. at 1029–30 (Smith, C.J., dissenting).

As in Moore, we conclude strict scrutiny applies. The interests to be protected through an independent candidate petitioning regime, as was at issue in Moore, are the interests of the voters and the independent candidate. The party petitioning restrictions at issue in the present case go farther and tread upon the collective interests of party members in associating to advance political beliefs. See Williams, 393 U.S. at 30 ("[T]he state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms."). Further, the requirements at issue in Moore were less demanding: a smaller signature requirement and a deadline 250 days

prior to the election (rather than 425). Moore, 854 F.3d at 1025. We easily conclude the current statutory requirements impose "a burden of some substance on a plaintiff's rights." Id. at 1026 (quoting Jaeger, 659 F.3d at 693).

In applying strict scrutiny, the district court identified hypothetical interests as asserted in similar cases including the need to avoid a crowded ballot or voter confusion and the general need to "protect the integrity of the elections process."[4] Arkansas appears to adopt these alleged interests on appeal. In addition, Arkansas points to the comparatively low vote total minor parties have attained in prior elections and describes parties that fail to garner 3% of the vote share as frivolous and therefore damaging to the integrity of the election.[5]

We harbor serious doubt that the generalized desire to maintain the integrity of elections and prevent ballot overcrowding can be viewed as a compelling state interest when the prior version of the statute undisputedly succeeded at preventing ballot overcrowding. The evidence at the hearing showed that no party previously

---

[4]Arguably, we could stop our analysis as to the Libertarian Party's likelihood of success on the merits with our conclusion that strict scrutiny applies. The district court correctly noted that the State failed to articulate clearly a compelling state interest to support the statute. We need not rest our decision on the State's omission, however, because, we reach the same result after a more complete analysis addressing the hypothetical interests that the district court identified, that the state asserts on appeal, and that largely align with interests asserted by states in other cases.

[5] It is doubtful that the repeated failure to attain the retention vote share in an election is an appropriate basis for characterizing minor parties as frivolous given the effect that minor vote share additions and detractions might have on the outcome in close contests between the major parties. We note, however, that Arkansas describes a particular instance of frivolity in a prior election involving the Libertarian Party that Arkansas characterizes as harming the general integrity of, and respect for, the election process. Namely, the Libertarian Party placed an Elvis Presley impersonator on the ballot for an office and listed the candidate as Elvis Presley.

achieved access during the years in which Arkansas had a 3% requirement, and even during the many years in which Arkansas had a 10,000 signature requirement coupled with a more forgiving deadline, there was no crowding of the ballot. The state's own expert witness acknowledged that only one or two new parties had ever qualified by petition under the 10,000 signature requirement. In fact, he opined that a ballot with two major parties and two additional parties appearing on a whole-ballot basis would not be crowded.

Still, assuming a compelling interest exists, and taking the general boundaries established by the cases discussed above, a regime containing (1) a substantial signature requirement, (2) a limited rolling window for obtaining signatures, and (3) a deadline 425 days removed from the general election is not narrowly tailored to a generalized interest in regulating the integrity of elections. This outcome is clear when the unprecedented time between the deadline and the election is not based on anything particular to petitioning parties, but instead is a date adopted by reference to other deadlines as applicable only to established parties. The asserted desire to move the primary date for established parties to Super Tuesday is unrelated to the process for new-party certification or new-party candidate selection via convention. And while there always will be some degree of arbitrariness in the precise selection of dates, the deadline in the present case is far beyond anything we previously have permitted. See McLain II, 851 F.3d at 1050 ("As with any percentage or numerical requirement, the precise date of the primary is to some extent 'necessarily arbitrary.'" (quoting Am. Party of Tex. v. White, 415 U.S. 767, 783 (1974))).

To counter the seemingly overwhelming nature of the law against it, the State focuses primarily on the signature requirement and ignores the relationship between early deadlines and the ability to procure signatures. The State relies on Jenness (which contained a 5% requirement) and several cases from other circuits or states in which courts refused to strike petitioning regimes with similar or higher signature requirements. See, e.g., Swanson v. Worley, 490 F.3d 894, 896 (11th Cir.

-18-

2007) (approving a signature requirement equal to 3% of voters from prior election coupled with a June deadline for independent candidates); Populist Party v. Herschler, 746 F.2d 656, 660–61 (10th Cir. 1984) (approving an independent candidate requirement of signatures equal to 5% of voters in last election 45–90 days prior to an election and 8,000 signatures by June 1 of election year for party recognition).  Here, the 3% requirement from the last election translates into about 1.5% of registered voters, numbers clearly below the figures at issue in the State's cases.  But, the district court in the present case did not hold as an abstract matter that Arkansas's signature requirement, if it stood alone, would present constitutional difficulties.   The district court held the current regime *as a whole* was unconstitutionally burdensome.  The signature requirement was simply the most conservative and least invasive path for the district court to follow when fashioning a preliminary remedy.[6]

Given the difficulty presented by the precedent and third-party experience under prior Arkansas statutes, the State also argues that the Libertarian Party failed to show that the present statutory requirements actually impose a real and personal burden on the Libertarian Party in this election cycle.  This argument is essentially an

---

[6]Further, all of the State's cases are readily distinguishable as involving much more forgiving deadlines or other mitigating factors. As accurately noted by Plaintiffs in their reply brief:

> [I]n each of those cases[,] the number or percentage of petition signatures required had not been increased back to a former requirement that had never been complied with, the petitioning time in many of the cases allowed seven months, one  year, or an unlimited amount of time [rather than 90 days], the petition signature deadline was well into the year of the general election rather than 424 days before the general election, and the ballot access requirements for new political parties . . . had actually been complied with.

Reply Br. at 26–27.

-19-

argument that the district court clearly erred in its factual assessment of the evidence presented at the hearing. It also speaks to the <u>Dataphase</u> factors of irreparable harm and the balancing of harms. In this respect, the State's argument comes closer to the mark.

Plaintiffs did not make an overwhelming showing as to the actual burdensomeness of the current regime on their own particular ability or inability to comply. Still, their showing was sufficient, and we find no clearly erroneous determinations by the district court. Arkansas argues its witnesses described a feasible path for compliance with a combination of paid and volunteer canvassers and the use of 90-day windows that would capture many large public events where signatures are more easily obtained. Arkansas also describes Plaintiffs' witnesses' descriptions of actual canvassing efforts as feeble at best. The district court discounted Arkansas's expert's opinion as to the feasible paths to success, finding that her cited examples of canvassing efforts were not analogous to the present situation: canvassing for ballot initiatives where interest was high as contrasted with canvassing for party access at a time far removed from an election. The district court also credited the testimony of the Libertarian Party officials who (1) described the burdensome nature of efforts less expensive than those proposed by the State's expert and (2) described the relative need for the Party to preserve funds for actual elections and candidate recruitment.

At the end of the day, Party officials clearly testified that they would not be able to meet the requirements, and their statements were fully consistent with past experience. Past experience showed that the 10,000 signature threshold and more forgiving deadlines were not an insurmountable bar but that no party in Arkansas could meet the more stringent requirements. Nothing the State presented compelled rejection of the Party's evidence, and the district court carefully explained its factual conclusions. The district court correctly found Plaintiffs were likely to succeed on the merits.

As to the remaining <u>Dataphase</u> factors and the balancing of those factors, we find no abuse of discretion. The State's pattern of success at limiting ballot access with its prior, more forgiving petition requirements shows that any harm caused by the current limited preliminary injunction is relatively minor in nature. The district court permissibly found the Party's inability to gain ballot access to be an irreparable harm that outweighed the lesser harm to the State in enjoining one portion of the current requirements. <u>See</u> <u>Wilson v. City of Bel-Nor</u>, 924 F.3d 995, 999 (8th Cir. 2019) ("When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." (quoting <u>Minn. Citizens Concerned for Life</u>, 692 F.3d at 870)).

Looking at the scope and form of the preliminary injunction, the State takes issue with the details of how the district court structured relief—enjoining the higher signature requirement rather than addressing a deadline. In arguing that this approach was impermissible, however, the State overly discounts the flexible nature of equitable, injunctive relief. Quite prudently, the district court wanted to avoid unforeseen collateral consequences of altering a complicated deadline scheme. And, as we noted in <u>Rodgers</u>, "equitable remedies are a special blend of what is necessary, what is fair, and what is workable." 942 F.3d at 458 (quoting <u>Lemon v. Kurtzman</u>, 411 U.S. 192, 200 (1973) (plurality opinion) (footnote omitted)). Simply striking the higher signature provision in favor of the prior, 10,000 signature requirement was workable and fair. Further, the State's arguments in this regard fail to acknowledge the relationship between the signature requirement and the deadlines; they are not wholly independent requirements that lack effect on one another. All in all, the district court's injunction was a much more conservative approach to the problem at hand than if the district court had altered deadlines. We find no abuse of discretion.

We affirm the judgment of the district court.

_____